Tilghman C. J.
This is an action of replevin for 300 barrels of flour, and the question before the jury was, whether the property was in the plaintiff on the 12th July 1809, when the writ was issued.' [Here the Chief Justice stated the material facts.] The jury found for the plaintiff, contrary to the strong inclination of the judge’s charge, and his counsel have endeavored to support the verdict on *two grounds: 1st, that there was no delivery of the flour; 2d, that the contract was rescinded by consent of both parties on the 11th July. I should have been well satisfied, if I could have found reason for agreeing with the plaintiff’on either of these points; for the case is extremely hard on him. But it appears to me that the jury were carried away by the hardship of the case. The flour was undoubtedly sold on credit, and delivered to the captain of the Hibernia by Davidson’s order. There is no ground for presuming that Davidson’s acceptance was wanting. It is true he was not present when the delivery was made, but he had bound himself on the 5th of July to consign 300 barrels of flour to Clegg and Pershouse by the Hibernia, and we hear of no other flour that he put on board that ship, nor was there the least evidence of his countermanding the delivery, or having any communication with the plaintiff on the subject, from the time of the purchase until the 11th of July, after the *374 delivery had been made. The conversation on the 11th of July negatives the idea of the contract being rescinded. An order for return of the flour was refused, and the reason assigned, to wit, that Davidson would do nothing partial in favor of one creditor. We perceive plainly that his feelings were in favor of the plaintiff; but what could he do ? How could he return the flour, after the receipt he had given to Pershouse? No doubt he would have been well pleased, if the plaintiff could by any legal means have regained the possession, and so he declared. This would have gratified him without subjecting him to censure. But he positively refused to do any act, whereby the contract might be annulled. I am not fond of setting aside verdicts. But where there appears to have been an evident mistake, justice demands that the cause should be reconsidered. The defendant has claims to a new trial which I do not think myself at liberty to withstand. I am therefore of opinion that the rule should be made absolute.
Yeates J.
On the present motion for a new trial, three questions arise.
1. Did the 800 barrels of flour pass from the plaintiff to the defendant Davidson, and become his property ?
2. If they so passed, did they revest in the plaintiff? And
*8. Had Davidson a legal capacity to rescind the contract made with plaintiff’?
1. The issue joined was on the plea of property, and the plaintiff’s replication affirms that the property was in himself, absque hoe, &c. Consequently to enable the plaintiff to recover, his right of action must have been complete, when he sued out his replevin on the 12th of July 1809.
There is no contrariety in the evidence. Davidson was examined by consent on the trial, and swore to having made his contract for the flour on the 7th or 8th of July 1809. The plaintiff’s day-book was shown to the jury wherein is this entry.
“July 6th, 1809: Nathan Davidson bought 800 barrels of flour, at seven dollars, on a credit of sixty and ninety days,
dolls. 2100
Inspection, at Id. each,
3 33
dolls. 2103 33”
Upon the day preceding, Davidson wrote to John Pershouse, informing him that he was putting 300 barrels of flour on board the Hibernia, to be consigned to the house of *375 Clegg and Pershouse in Manchester, and directing insurance thereon to be made on his account, to the amount of 500?. sterling. And on the same day, Davidson gave a receipt in these words. “Received Philadelphia July 5tb 1809 of Mr. J. Pershouse, 16,000 dollars, equal at par to 8600?. sterling, for advance on shipment of 158 bales cotton shipped on board the British barque Esther consigned to Messrs. Clegg and Pershouse, on also a shipment now making of flour and cotton on board the British ship Hibernia, to be consigned also to Messrs. C. and P. N. Davidson.”
Davidson contracted with the ship’s husband for the freight of the flour to England, and the whole quantity was laden on board the vessel then lying at the wharf, pursuant to the terms of the contract, before he stopped payment on the 11th of July. This appears clearly by the declarations of plaintiff as well as written evidence. It would take considerable time to put so large a quantity of flour on board, after removing it from the store of Clemson. Upon the next day, Clemson called upon Davidson for his promissory notes, when he was first made acquainted with the failure of Davidson. On '^receiving this intelligence, he did not press for the notes, but his anxiety was directed to getting back his flour. This then was a contract made in the usual course of business, a sale of merchandise upon credit, attended by a complete delivery, and would certainly pass the property to the vendee. It cannot be denied, that if the vessel had sunk at the wharf, or been consumed by fire, that the amount of the flour could have been recovered by Clemson from Davidson, if the latter had been solvent. In the present case, I am not aware of any fact that appeared on the trial before me, which would induce me to conclude that there was not a full and complete delivery in pursuance of the contract.
2. No part of the evidence warrants us in asserting that the original contract was rescinded. In the embarrassed state of Davidson’s affairs, he declared he would do nothing which might appear partial in favor of a particular creditor. He was applied to for an order to get back the flour, but he declined giving it. Clemson applied to him again, but he again refused. That he felt the hardship of Clemson’s case, no one can doubt; every honest mind would feel for him. The question is not, what were his feelings or wishes on the subject, but what unequivocal act he did in order to vacate the contract. At most he was merely passive, and as he expressed himself had taken his stand. That he cautiously avoided doing an act, which might change the relative situ *376 ation of his creditors, appears also from this, that when Pershouse asked him for something more to enable him to hold the flour, he wholly declined it.
8. I adhere to the opinion which I expressed to the jury on the trial, that the receipt of the 5th July 1809 did not disable Davidson from rescinding the contract previously made with Clemson, if he chose so to do. Advances of money in order to procure consignments are usual in trade ; but the property in the merchandise contracted to be consigned, does not pass thereby. That Davidson would have made himself liable to Pershouse for a breach of the engagement, there is no doubt; but the point is, did an ownership in this specific flour vest in Pershouse by this receipt, without any bill of lading signed for that purpose? The oath of Davidson was, that the shipment was to be made on his own account and risk, the proceeds to be applied to his credit, and Pershouse *was merely his agent in the business. Davidson alone made the contract for the freight, and was the only person known to the ship’s husband in the transaction. The written papers subscribed by him, as well as the accounts of sales of the flour and cotton, show that he was the owner, and that if the articles had miscarried in the voyage to Great Britain, he must have been the loser thereby, if he could not procure an indemnity from the underwriters. The flour when laden on board the vessel, was subject to his control, and the captain held it for his use, until he signed a bill of lading by his directions. Circumstanced as this case was, there could be no stoppage in transitu by Pershouse, nor could the British house have any specific lien on articles neither actually nor constructively in their possession. The flour might have been levied on under an execution issued against Davidson. In case of his death before the ship had left the wharf, his personal representatives would have succeeded to the possession of it; but in case of their diverting it from its destination under the contract, they would have been responsible to the right of action of Pershouse.
The light in which I have considered the evidence on the two first points, has rendered it unnecessary to go more fully into the last. But as the question has been made on a supposed misdirection, I have deemed it proper to state the grounds on which I had formed my opinion.
I do not see how the present verdict can be supported, without violating the principles of established law, and I am therefore of opinion that a new trial should be granted.
Brackenridge J.
It would seem to me, that as between Clemson and Davidson in this case, the property was not *377 changed. The entry of the seller in his book—“ Flour bought on a credit of sixty and ninety days,” must be taken with the testimony, that “ notes were to be given payable at sixty and ninety days.” Notes are cash to a merchant. He can indorse them and send them to market for cash, and this is the use that is made of them if the holder so chooses. It cannot therefore he taken that the credit was given independent of this condition. If this was an act to be done eotemporaneous with the delivery of the goods, they cannot be considered as delivered till this act was done. The flour *was to be put on board the Hibernia, before the notes were demandable. I will not say delivered ; but the seller in the honesty of his heart did put it on board of the Hibernia before he demanded those notes. He might have insisted that the notes should have been given before the flour left his store. It could not but have been the understanding of the parties that the giving the notes ivas to accompany the delivery, and solvent notes, which would give a reasonable assurance of being paid at sixty or ninety days; for notes that in the acknowledgment of the buyer could not be expected to be paid, were not the notes which the contract contemplated. They were notes nominally, but not really, to secure the payment. The seller indorsing them and taking them to market, would but in fact give his own notes. The flour being placed on board the Hibernia, and the notes demanded, the buyer refused to give notes, and for a good reason, because they would be of no value; he had stopped payment and was insolvent. Had they been offered or even given, and the seller had discovered this before obtaining the captain’s bill of lading and delivering it, he could have stopped the property in transitu from coming to the hands of Davidson.
Davidson himself would seem to have had this idea of the matter. He considered the putting on board the Hibernia as short of a delivery ; and that the producing the captain’s bill of lading was necessary to complete it. He says on his examination, “ that he would not have paid the money,” that is, as he must mean, that he would not have given the notes, until he had a voucher from the captain that the flour was on board. “ I would not have paid for the flour, until I had received the captain’s bill of lading.” I do not say, nor is it necessary for me to say, that he would not have been compelled to pay had the bill of lading not have been produced ; for it maj' be that the law would consider him as bound by the putting it on board the Hibernia, if the seller chose to consider it a delivery. For it does not seem to be a part of *378 the contract that the bill of lading should be a necessary voucher of his having complied with his part of the contract. But I hold it, that in contemplation of law the property could not be considered as delivered, so as to bind the seller, until the consideration was received, upon which that delivery was, in the nature of the contract, and the '^understanding of the parties, to be made. This was the giving the notes. This cannot be distinguished from the giving money. For if not money, it was the value of money, or rather the sign of it.
The question that goes to the foundation of the case will be, was the delivering the flour and the giving the notes, acts that were to go together? Was there no precedence to be settled? Was it understood that the one should proceed pari passu with the other? It is impossible for me to see in this contract but that the acts were to be concomitant;—concurrently performed. Who could doubt this unless he were to say that on the part of the buyer the contract was executory? That the whole of what he was to do, was to be performed at a distant day? But this does not appear. A part was to be performed, that is, the giving the notes, instantly; for no time is given to the giving the notes, though there is, as to the payment of them, a credit of sixty and ninety days. The fallacy in the argument of this case, or the error in the conception of'it, is in the not distinguishing the giving notes, from the credit given for the discharge of them. It is considered as a sale at credit, and as if nothing was to be done by the buyer before the day of payment. Yet who could suppose, having a knowledge of business, that the seller was to wait the sixty or ninety days before the notes were given ? The giving the notes must be considered as an act 'to be done in the first instance, and before the credit began to run. It was a fraud to withhold them, or to consider the delivery complete, short of this part performance of the contract.
It is not necessary for me to say that the payment of the price, or tender of it, is a condition precedent. Yet, as in strictness it is but the sign of value, I believe it should be so considered. Certain it is, that in the old books, it is so considered. Hobart 4, lays it so down, and cites the Year books for his authority. “ In all personal contracts, the pro quo works by condition precedentas if I sell my horse for ten pounds, you shall not take my horse except you pay me ten pounds. And if A sells cloth to B, but B does not pay, it is in the election of A to make it a bargain or not. But he may make it a bargain if he will, and bring debt for the money.” Shep. Touch. 229. Even earnest given upon a *379 sale of goods does not alter the property contracted for, but only binds the bargain. Comyns on Cont., cites Bull. N. P. *50, who cites 1 Salkeld 118. “I state it to be a clear proposition,” says a late English judge, “that the vendor of goods not paid for, may retain the possession against the vendee, not by any rule of equity merely, but on ground of law.” But even in strictness I do not insist upon it, though the language of the books, recognized by a dictum of Lord Loughborough, in Lickbarrow v. Mason, seems to look that way, that the payment of the price, or a tender of payment, is a condition precedent. It is enough for me in this case, if the acts are considered simultaneous, or as going together. To hold it otherwise, would sanction injustice in particular cases, and might introduce a general inconvenience; the necessity of such circumspection and wariness as must embarrass the transactions of men. The seller must hold his horse by the tail, and give the buyer the head only till the money is paid. The shopkeeper cuts off his yard of cloth and hands it; but he must take care that he receives the price before he lets it wholly go. Stating a thing in the extreme illustrates the principle. I take these minute cases in order to simplify my meaning. In dealings, where there is no trust, but deception is expected, and as likely to take place as good faith, or more so, to be upon our guard to this extent is necessary; as in war, where stipulations are mutually to be performed, and one enemy is apprehensive of an advantage to be taken by another. Or as Ajax, wrestling with Ulysses, says
“ Or let me lift thee, chief, or thou lift me.”(a)
The question was, who should have the advantage of the first trip; for he who watches the effort, has the advantage of him who struggles to put down. In fact, Ulysses, in this case, got a back lock upon Ajax, who though the stronger man, was put down. So will it always be with the wary knave and the honest man. With a view to this, it will be a matter of contention always who shall do the first act. The principles of contract, do ut des, fado ut facias, will be ■evaded, and the conditions on one side or on the other frequently fail to be performed.
But Davidson had in the meantime sold to a purchaser, who had paid him, at least in part, for this property. How *eould that affect Clemson, who knew nothing of it? It would be a fine cover for swindling, if that *380 could make any difference. I do not consider the property changed by going to the wharf, or by being put on board, any more than if it had remained in the store of Clemson. It was but sub conditions that it was put there, and was subject to the lien of the vendor until good and solvent notes had beeu tendered or were given. The merchant’s entry in his book, which is construed as conclusive evidence of a delivery, was but a memorandum for himself, and imperfect as it related to the whole agreement. It is but a catch upon him to give to that entry this effect, which it could not have been intended that it should have. It must be taken with the evidence of Davidson ; and even if taken by itself, it carries evidence intrinsic from the words, that the credit noted must be a credit on notes given; for this is the usage of giving credit in such cases.
I am clear that the delivery was but begun to be made, and in completion only until the notes were given. This not having been done, I think the property was not changed so as not to be subject to be recovered back under the replevin, to give the seller the actual, as he still had the legal, possession.
I cite 6 Mass. Rep. 321. Assumpsit for New England rum sold and delivered to the defendant, in consideration of a note given, which turned out to be forged. Action maintainable notwithstanding the delivery, had the defendant known the note to be bad. "What difference where the note promised is not given ? This by Chief Justice Parsons. It goes to show that there is no such magic in an entry in a book, of sale and delivery, or of an actual delivery and change of possession, as to change the property, where the consideration that was understood to be concurrent does not pass.
New trial awarded.

 Iliad, 23 v. 725.