## Wenger *et al.* *versus* Barnhart *et al.*

1. Brown agreed to buy flour for plaintiffs and received from them money for it; defendants, at his request, no price being agreed on, sent him 65 barrels to a station on the railroad to go to plaintiffs at Reading, and directed the agent at the station to load it; about the time the loading had been completed, but before the car had been closed or moved from the siding, the defendant, hearing that Brown was insolvent, came to the station, directed the loading to stop and had the flour shipped on his own account to Philadelphia. *Held*, that the court should have charged that the delivery was not final and complete until the flour had passed wholly out of the power of the defendant into the possession of the railroad company for transportation to Reading.

2. Completeness of delivery to Brown was not a test of delivery to the plaintiffs.

3. Circumstances of alleged delivery examined and discussed.

May 15th 1867.  Before WOODWARD, C. J., THOMPSON and AGNEW, JJ.  STRONG and READ, JJ., absent.

Error to the Court of Common Pleas of *Lancaster county*.

This was an action of trover, brought November 22d 1867, by F. S. Barnhart and James Koch, trading as Barnhart & Koch, against Joel Wenger and Samuel Wolf, Jr., for the value of 65 barrels of flour.

Isaac Brown, a witness for plaintiffs, testified that the plaintiffs, who lived in Reading, and with whom he had been in the habit of dealing in flour, said they must have 100 barrels of flour; that he replied he could not tell where he could get that much; that he had 25 barrels of Burkholder's brand, and that he would get as much as he could; they then gave him $1100, but they had not agreed on the price of the flour; the plaintiffs told him to get Wenger's if he could.  He called twice on Wenger, who told him he had none to spare.  At a third visit Wenger told Brown he thought he would have to give him the flour, but said he could not let him have 75 barrels.  Brown told him " to put as much as he had to the New Berlin station," on the Columbia and Reading Railroad, and load it with Brown's 25 barrels, and from the station they were to send it to Reading, to the plaintiffs.  There was no price fixed by Wenger.  There was other evidence of Brown's transaction with Wenger about the flour, not differing materially from Brown's statements.  Brown said he bought the flour for himself, and was never agent for the plaintiffs, and was not at the station to receive it.  Wenger afterwards sent word to Wolf, who was in the employ of the railroad company, at the New Berlin station, to load 65 barrels of his flour for Brown, to be delivered to Reading to the plaintiffs.  Wolf's clerk then made this entry in the manifest book :—

"December 27th 1865.    Manifest 313.    Consignor, Isaac Brown.    Consignee, Barnhart & Koch.    Description of articles,

[Wenger v. Barnhart.]

90 bbls. flour, marked 'Reading.' Weight, &c." The warehouse and siding at the station belonged to Wolf,—the car to the railroad company."

Wolf's hands, on receiving the order from Wenger, proceeded to load the car, which was standing on the siding. They put Brown's 25 barrels in first, and then the flour of Wenger. Before the car was closed, Wenger came to the station and said Brown was failing, and directed them to take Brown's 25 barrels from the car, which was done, and the car was loaded with 100 barrels of Wenger's flour, which was shipped to Philadelphia. After Wenger's 100 barrels were loaded, the clerk erased the entry before made in the manifest book, and made a similar entry of the shipment of the 100 barrels by Wenger to Philadelphia. There was some conflict in the evidence as to whether all Wenger's flour had been loaded when he countermanded his order to ship it for Brown's account; some of the evidence being that there were 5 or 6 barrels not loaded, some 2 or 3, and some that it was all in the car. Wenger afterwards told Brown that he had heard that he was failing, and had stopped the flour; Brown told him it was right. Brown had given a large judgment the evening before to one of his creditors; was afterwards sold out by the sheriff, and had made an assignment.

The plaintiffs submitted the following points, which were answered by the court (Hayes, A. J.) in the affirmative :—

"1. If Wenger and Brown agreed for the delivery of the flour at the New Berlin station, and the jury believe that the directions to ship the flour in Brown's name to the plaintiffs at Reading were a mere message from Brown to the warehouseman at the station, the delivery to Brown was complete when the flour was loaded into the car for plaintiffs.

"2. If Brown purchased the flour to send to the plaintiffs at Reading, and was paid for it by them in advance, and Wenger knowing this agreed to deliver the flour to Brown at New Berlin to be shipped in Brown's name to the plaintiffs, the loading of the flour into the car for the plaintiffs vested the right of property and possession in them.

"3. If the delivery of the flour to Brown at New Berlin was final, and it was there by his directions loaded into a car for the plaintiffs, who had paid for the flour in advance, it had passed out of the power of both Wenger and Brown, and no agreement or arrangement between the latter, knowing the circumstances, could affect the rights of the plaintiffs."

The court, after recapitulating the facts, further charged :—

"It is unquestionably the law, that the vendor's right of *stoppage in transitu* is at an end, when the goods reach their destination ;—up to that point it is in force.

"The ultimate destination has been spoken of in the discussion

[Wenger *v.* Barnhart.]

of this matter: and where there are several stages in the transmission, under the contract, the ultimate destination is the essential point.   In a general sense Reading was the ultimate destination of this flour; but with respect to the contract of Wenger and Brown—the New Berlin station was the only destination—and the delivery there by Wenger completed their contract.   He was responsible for nothing beyond that.   It is said, the car into which this flour was put by Samuel Wolf was on his siding and not on the railroad.   But the car was furnished by the carriers, the railroad company.   Wolf was their agent, and I cannot perceive that the position of the car when it was loaded makes any material difference.

"If the jury believe the contract of Wenger with Isaac Brown was to deliver 65 barrels of flour at New Berlin station, to be forwarded by railroad in Brown's name to Reading for Barnhart & Koch—if they moreover believe that in compliance with this contract the 65 barrels of flour were so delivered at the New Berlin station—there is an end of the question.   Joel Wenger had no right to retake this flour, or intercept its transmission.   In regard to the contract between him and Brown, its transit was finished.   In regard to the contract between Brown and Barnhart & Koch, he had no concern with the transportation from New Berlin station to Reading; he had nothing to do with that contract, and there was no right of *stoppage in transitu* incidental to the passage of this flour from New Berlin to Reading.   No such right belonged to Brown, for he had been paid for the flour by his consignees, the plaintiffs.   [It is said, however, that these 65 barrels of flour were already at the New Berlin station.   Does that alter the case ?   Suppose they were already delivered to be sent elsewhere, and Joel Wenger chose, as he had a right to do, to change their destination, and as he did by ordering them to be loaded for Brown, with his 25 barrels for Reading ; this was equivalent to a delivery, after purchase from his mill, to the New Berlin station, and more especially as the 65 barrels were separated from his other flour, rolled out upon the platform and thence into the car, except a few barrels, according to some of the testimony, which were not yet put into the car, when Joel Wenger interfered with the proceeding.   The separation from the mass of Wenger's flour was completed in accordance with his order, effected by agents of the railroad company to whom it was addressed ; and it was too late for Joel Wenger to assert his right of arresting the property *in transitu*, if he had delivered the flour agreeably to his contract with Brown."]

The verdict was for the plaintiff for $763.02.

The defendants removed the cause to the Supreme Court.

The errors assigned were the part of the charge in brackets,

[Wenger v. Barnhart.]

affirming the plaintiffs' points, and the judge saying that the ultimate point of destination was New Berlin.

*T. E. Franklin* and *A. H. Smith*, for plaintiffs in error, cited 2 Kent Com. 540; Story on Sales 257; Hays *v.* Mouille, 2 Harris 48; Whitehead *v.* Anderson, 9 M. & W. 518; Donath *v.* Broomhead, 7 Barr 301; Clemson *v.* Davidson, 4 Binn. 405; s. c., 5 Binn. 392; Schumacher *v.* Eby, 12 Harris 521.

*I. E. Hiester* and *O. J. Dickey*, for defendants in error, cited Clemson *v.* Davidson, 4 Binn. 405; s. c., 5 Binn. 398; 1 Parsons on Contracts 484–90; Addison on Cont., 259–60; Story on Cont. § 823; Story on Sales, § 290, 335; Rowley *v.* Bigelow, 12 Pickering 313–14.

The opinion of the court was delivered, July 3d 1867, by
AGNEW, J.—We think that the effect of the charge was to mislead the jury on the vital point of the case. Taken singly, perhaps no part of the charge can be said to be clearly erroneous. The judge very correctly stated that it was a question of delivery by Wenger at New Berlin, and that after delivery there, he had no right of stoppage *in transitu.* But the real question before the jury was, what constituted a delivery and whether it was complete? Upon this point the charge, as a whole, must have led the jury to believe that the verbal order sent by Wenger to Wolf to load up a car with sixty-five barrels of his flour, along with Brown's twenty-five barrels of Burkholder's brand, and the fact of rolling out Wenger's flour to the car and proceeding to load it up, was a complete delivery. But this was a very inadequate instruction upon the facts, which were rather peculiar, and tended to lead away the attention of the jury from those things which militated against the completeness of the delivery.

This was an action of trover and conversion, in which the plaintiffs were bound to show a title fully vested not simply by their own order for the flour to Brown, and payment in advance to him, but by a full and complete vesting of title in Brown through his purchase from Wenger. Their transaction with Brown was before he had even spoken to Wenger to sell him the flour. On the question whether the title to the flour had ever fully vested in Brown, the evidence shows that no part of the price had been paid to Wenger, the price being left open, depending on the Philadelphia prices. Brown himself admits and testifies, as the plaintiffs' own witness, that the only understanding between him and Wenger was, that Wenger should put in the flour at New Berlin, and forward it to Barnhart & Koch, at Reading, in Brown's name. He stated twice in chief and once in cross-examination that Wenger was to send the flour to Reading. He

[Wenger *v.* Barnhart.]

admits that he was not at New Berlin to receive and forward the flour. In fact, he saw nothing more of Wenger until the time Wenger came and told him he had countermanded the sending of the flour, in which he acquiesced. He does not allege, nor was there any proof that Wolf, the agent keeping the forwarding warehouse at New Berlin, where Wenger's flour was lying, was authorized by him to accept and receive delivery for him. So far as Wolf had anything to do in the matter he was acting under Wenger's orders, and not as the agent of Barnhart & Koch.

Eli Wolf, the son of the warehouseman, testifies that the order delivered by Wenger's teamster was to load sixty-five barrels of Wenger's flour for Isaac Brown, to be delivered at Reading to Barnhart & Koch, and this is substantially the testimony of Moses Butcher, the person by whom the order was sent. When he brought the word young Wolf made the entry in the manifest book, but this was done not as a record of the delivery, but as a memorandum of the order, for the flour had not then been separated or rolled out upon the platform ; and the entry was crossed out by him as soon as he discovered that it was prematurely made. There was contradiction in the testimony as to whether the flour was fully loaded into the car when Wenger came and countermanded the order to freight it—probably the weight of the evidence is that it was not. But be this as it may, it is very clear that the car was yet standing upon the siding, was still unlocked, and had not been fully delivered into the custody of the railroad company for transportation. Neither Brown himself nor the plaintiffs, or any one for them, was present to receive the flour, and the whole matter was as yet in the hands of Wenger himself, who had undertaken with Brown to send the flour. To say, under such circumstances, that there was a full, final and perfect delivery to Brown to the use of Barnhart & Koch, as against the owner who had never received payment, and who up to this point had the business wholly in his own hands, and this in favor of an insolvent purchaser, is to hold the law of delivery too stringently. The jury ought to have been instructed that the delivery was not final and complete until the flour had actually passed wholly out of the power of Wenger into the possession of the railroad company for transportation to Reading. This was the express understanding between Brown and Wenger, and the case is to be measured by their understanding, and not by the previous arrangement between the plaintiffs and Brown.

In a contract so incomplete as this was, left so wholly to the seller to be carried out, and without any agent to accept delivery, except as he was implied to be the carrier by whom the flour was to be forwarded ; the evidence of a full and complete delivery to the carrier should be distinct and clear to divest one man of his property, without payment of the price, in favor of one whose

insolvency is not discovered until the very moment of fulfilment. The charge left the jury to understand that much less would suffice to pass the title, and in view of this general effect, was erroneous.

Judgment reversed, and a *venire facias de novo* awarded.

This case was again tried in the court below, on the evidence given on the former trial, together with evidence of declarations by Wolf, one of the defendants, that Brown had come to the station from Reading, and said he had got $1100 from Koch, and that he went to Wenger and bought flour, and ordered it to be sent to Wolf's warehouse; also that Wolf said that just when the last barrel had been put in Wenger came and said it must be unloaded; also, evidence by Brown, that he said to Wolf, at the time above referred to, that he had twenty-five barrels of flour, and that he wanted to make up a load to go to Barnhart & Koch; that Wolf said he would receive the flour and attend to it.

The court (Hayes, A. J.) charged the jury:—

* * * "Wenger sold the flour in question to Isaac Brown, and received nothing for it; and Barnhart & Koch gave Brown $1100 to buy this flour, and did not obtain a pound of it. In point of equity and justice, as suitors, they occupy a position of equality before the court to test the right in law to the property in dispute.

"The Supreme Court have had the case under consideration, and in relation to it have given their opinion, which has been presented and read on this trial. The court and the jury have been admonished, with much emphasis, that neither the court nor the jury can disregard that opinion without a violation of their oaths. Unquestionably the decisions of the Supreme Court are of binding authority in this court—it is our duty to accept their interpretation of the law. What they decide and rule as law we hold to be the law; and if we err, this court and not the jury are responsible. The jury must look to the presiding court for instruction as to the law, and are neither required nor authorized to go behind or beyond this court to ascertain what the law is. After reading the opinion of the Supreme Court, reviewing the former trial, we experienced some difficulty in determining how to charge the jury here. Our first thought was to repeat the former charge, omitting or altering those portions which might be found obnoxious to the criticism of the court of review, and adding such remarks as the additional evidence adduced on this trial should demand. But on examining the charge we could come to no other conclusion than that of the Supreme Court, that there was nothing clearly erroneous in any part of it, and therefore what to omit or what to alter we were at a loss to discover. It was a peculiar case. The error was not in the parts but in the whole; the parts were sound, but the whole defective—the maxim

5 P. F. SMITH—20

often quoted not applying here, *falsus in uno, falsus in omnibus*, but rather this—*falsum in nullo, falsum in omnibus;* not clearly wrong in *any particular*, but wrong *altogether*. As we are not satisfied that we could do justice to the case now on trial by presenting to this jury the former charge with modifications, we consider it right to charge specially on the case, as it stands at the present trial. But in what we have just said we must be understood as by no means ignoring the opinion of the Supreme Court. Our intention is to steer by their compass, and if we fail to see the direction in which the needle points, it will be owing to our seeing but darkly through the glass that covers the figures.

" In reviewing the former trial of this cause, the Supreme Court remark that ' taken singly, perhaps no part of the charge can be said to be clearly erroneous, but the effect of it was to mislead the jury on the vital point of the case.' ' The judge,' say the Supreme Court, ' very correctly stated that it was a question of delivery by Wenger at New Berlin, and that after delivery there, he had no right of *stoppage in transitu*. But the real question before the jury was, what constituted a delivery, and whether it was complete. Upon this point the charge, as a whole, must have led the jury to believe that the verbal order sent by Wenger to Wolf to load up a car with sixty-five barrels of his flour, along with Brown's twenty-five barrels of Burkholder's brand, and the fact of rolling out Wenger's flour to the car and proceeding to load it up, was a complete delivery.' ' This,' the Supreme Court say, ' was a very inadequate instruction upon the facts, which were very peculiar, and tended to lead away the attention of the jury from those things which militated against the completeness of the delivery.'

" The cause has been remanded by the Supreme Court on a *venire de novo :* that is, for a new trial ; and your duty, gentlemen, is precisely that of the former jury—to render a true verdict according to the evidence. The former jury were misled—of course without any effort or intention of this court—but, as the Supreme Court say, by the effect of the charge as a whole, which must have led them to believe that the order of Wenger to Wolf, and the fact of rolling out Wenger's flour to the car and proceeding to load it up, was a complete delivery. My endeavor now shall be, that *you* be not misled. I say, then, that with respect to all questions of fact in issue here, you are the sole judges, and must determine every such question according to the evidence before you—that is to say, the testimony of the witnesses and the book of freight manifests. Where there is a diversity of testimony, it is for you to say what is the truth of the fact. In regard to the facts, the court cannot easily err, except by assuming to decide what the facts are, and thus withdrawing such questions from the jury.

[Wenger v. Barnhart.]

" What constitutes delivery, and whether it was complete in this case, is the real question before the jury, according to the Supreme Court.

" 2 Kent Com. When the terms of sale are agreed on, and the bargain is struck, and everything that the seller has to do with the goods is complete, the contract of sale becomes absolute, without payment or delivery, and the property vests in the buyer; but he does not acquire the right of possession, until he pays or tenders the price. But if the goods are sold upon credit, and nothing is agreed upon as to the time of delivering the goods, the buyer is immediately entitled to the possession, and the right of possession and the right of property vest at once in him; but the right of possession is still liable, if he becomes insolvent before he obtains possession, to be defeated by the vendor's right to stop the goods on their passage; that is, before the purchaser obtains *actual possession*, which completes the delivery. The vendor or seller, in this case, was Joel Wenger; the vendee or buyer, Isaac Brown; the goods sold were 65 barrels of flour. If, by their agreement, the flour was to be delivered to Brown at the New Berlin station, Wenger, even if he despatched the flour to that place, and Brown became insolvent, had the right in virtue of his original ownership, to stop it *in transitu;* that is, to reclaim it before the actual possession passed to Brown. The passing of this actual possession constituted a delivery. Did the actual possession of this flour pass to Brown? This is a question of fact, and you will decide it. The delivery to an agent authorized by the principal to receive, is delivery to the principal. The passing of the possession of this flour to Samuel Wolf, if he was the agent authorized by Isaac Brown to receive it for him, was a delivery to Isaac Brown. Was Samuel Wolf Isaac Brown's agent? Another question of fact to be decided by you, according to the evidence. Isaac Brown, being asked on this trial, ' Did you see Mr. Wolf when you returned from Reading, after you got from Barnhart & Koch the $1100, and what conversation had you with him?' answered, ' All that I said to Samuel Wolf, at that time, was that I had 25 barrels of flour, and that I wanted to make up a load to go to Barnhart & Koch. Mr. Wolf said he would receive the flour and attend to it.' Eli Wolf testified that Wenger's teamster delivered a verbal order December 27th 1865, betwixt 9 and 10 o'clock in the morning, that we should load 65 barrels of Wenger's flour for Isaac Brown, to be delivered to Reading for Barnhart & Koch, to be loaded with 25 barrels of Burkholder's brand, which belonged to Isaac Brown. Isaac Brown said, on his cross-examination:—' I told Wenger to send it—to put it to the New Berlin station and send it to Barnhart & Koch, Reading, in my name, like as he had done before.' Isaac L. Royer said he was present when

[Wenger *v.* Barnhart.]

Brown bought this flour of Wenger; that he told Wenger he had sold the flour to Barnhart & Co., that he had got something like $1100 in money, and he must have the flour.    Isaac Brown stated that Koch had said they must have 100 barrels of flour; that he (Brown) said he would get as much as he could ; he had fetched 25 barrels of Burkholder's flour; then Koch gave him 1100 in money; ' Koch said I should get of Wenger, if I could ; he would send a car next week; I told him I would get the flour if I possibly could ; he then went to Wenger and made the bargain with him for the 65 barrels; from New Berlin station they were to send it to Reading to Barnhart & Koch.   Eli Wolf testified that his father was the agent of the railroad company, that the book of freight manifests, which he kept, belonged to the company ; that the car in which this flour was loading was the company's car, and after receiving the order from Wenger, he made this entry on the company's book: 'December 27th 1865.    Manifest 313. Consignor, Isaac Brown : Consignee, Barnhart & Koch.   Description of Articles—Ninety barrels of flour, marked Reading : weight 18,000 pounds: rate, 6¼ cents; fourth class, one hundred and twenty-five dollars; payable on delivery, eleven dollars and twenty-five cents.'

" On receiving the order of Joel Wenger, Samuel Wolf proceeded to separate the 65 barrels of flour from a larger quantity of Mr. Wenger's, and to load them in the company's car, standing on his siding — which was nearly accomplished when Mr. Wenger arrived, and prevented them from proceeding further.

" If, upon the whole evidence, and according thereto, you decide that Samuel Wolf was the agent of Isaac Brown in regard to this flour, and, in pursuance of Joel Wenger's orders, took actual possession of these 65 barrels of flour to load them for Isaac Brown, and as the company's agent to forward them to Reading in Isaac Brown's name, to Barnhart & Koch, as his consignees, this fact of his thus taking possession completed the delivery, and Joel Wenger could not lawfully intercept their transportation ; and the verdict should be for the plaintiffs for the value of the flour.

" But if you decide that, according to the evidence, Samuel Wolf was not the agent of Isaac Brown, and did not take actual possession of the flour to load it for Isaac Brown, as the company's agent to forward it to Reading in his name, to Barnhart & Koch as consignees, then Joel Wenger was in time to reclaim the flour by stoppage *in transitu ;* and the verdict should be for the defendants."

The verdict was for the plaintiffs for $763.02.

The defendants removed the case to the Supreme Court, and assigned for error—

[Wenger v. Barnhart.]

1. The court erred in saying that Barnhart & Koch gave Brown $1100 to buy *this* flour.

2. The court erred in saying that Royer said that he was present when Brown bought this flour of Wenger; whereas Royer says he was present when Brown bought this *seventy-five* barrels of flour of Wenger.

3. The court erred in their criticism—called preliminary remarks—of the opinion of the Supreme Court.

4. The court erred in disregarding the instructions of the Supreme Court on the vital points which militated against a full, final and complete delivery of the flour.

6. The charge as a whole was erroneous and not in conformity with the opinion of the Supreme Court.

7. The court erred in charging, "If upon the whole evidence and according thereto, you decide that Samuel Wolf was the agent of Isaac Brown in regard to this flour, and in pursuance of Joel Wenger's orders took actual possession of these 65 barrels of flour to load them for Isaac Brown, and as the company's agent to forward them to Reading in Isaac Brown's name to Barnhart & Koch as his consignees; this fact of his thus taking possession completed the delivery, and Joel Wenger could not lawfully intercept their transportation; and the verdict should be for the plaintiffs for the value of the flour:"

*A. H. Smith* and *T. E. Franklin*, for plaintiffs in error, cited Sharswood's Com. Law 76, 77; Bolin v. Huffnagle, 1 Rawle 17, 18; Cabeen v. Campbell, 6 Casey 260.

*I. E. Hiester* and *O. J. Dickey*, for defendants in error, cited 1 Parsons on Contracts 484, 90; Addison on Contracts 259, 60; 2 Story on Contracts, § 823; Story on Sales, §§ 290, 335; Rowley v. Bigelow, 12 Pickering 313–14; Clemson v. Davidson, 4 Binn. 405, s. c. 5 Id. 392; Schumacher v. Eby, 12 Harris 521.

The opinion of the court was delivered, May 14th 1868, by

AGNEW, J.—We will not step out of our way to notice the moods of judges in the lower courts when they make the reversal of their judgments a personal affair and lose their temper, and it is unnecessary to vindicate our unanimous opinions.

But error has been assigned to the criticism of the worthy judge below in his charge upon our former opinion, and complaint made of his manner and tone as calculated to impress the jury unfavorably to the justice of the cause. We are therefore compelled to pass upon this assignment of error.

We are unable to judge of the tone and temper said to have been displayed except from the language used. There seems to

[Wenger *v.* Barnhart.]

be nothing in this part of the charge calculated to stir up the pre-judices of a jury so seriously as to require a reversal of the judg-ment, although the spirit of his commentary undoubtedly must be carried forward to the final instruction in considering the effect of the latter as a proper guide for the jury. The most spirited portion of his criticism being couched chiefly in a dead language, it is not probable it was understood by a Lancaster county jury, and certainly it was not intended for them. Upon the whole, we are not sure that the charge in this respect amounted to an absolute error.

That taken singly no part of a charge may be pronounced to be clearly erroneous, and yet that as a whole it may mislead, is a matter familiar to the mind of lawyers and judges. Philadelphia & Reading Railroad Co. *v.* Spearen, 11 Wright 303; Reeves *v.* Del., Lack. & West. Railroad Co., 6 Casey 460. Had the language and spirit of our former opinion been weighed in a frame of mind more favorable to its reception, not seeing through a glass darkly, the learned judge would not have fallen into his former error.

This is an action by Barnhart & Koch, the alleged consignees of the flour. *They* must show title in themselves, and not only that title by delivery had vested fully in Brown, the purchaser of the flour from Wenger, but that his title had become fully vested in themselves by delivery to the railroad company for transpor-tation to them as consignees of Brown, before Wenger counter-manded the delivery. Hence we said in our former opinion, the jury ought to have been instructed that the delivery was not final and complete until the flour had actually passed wholly out of the power of Wenger into the possession of the railroad company for transportation to Reading. We pointed out the numerous facts militating against the conclusion that there had been such a de livery, especially the distinct agreement between Brown and Wenger, that Wenger should forward the flour to Reading, making him the actor in the transaction, and enabling him to control the flour until it had actually passed beyond his power into the hands of the railroad company, for delivery to Barnhart & Koch, at Reading. Such a delivery to the company was the point to be distinctly presented to the jury, to prevent them from confounding it with a mere delivery to Brown. Completeness of delivery to Brown was not the test, for as to him the retaking of the flour by Wenger on his discovery of Brown's insolvency was ratified, Brown having acquiesced in it when informed by Wenger, and expressed his preference that Wenger should have the flour rather than the plaintiffs. Yet the learned judge left the case again to the jury on the fact whether Wolf, as the agent of Brown, in pur-suance of Wenger's order, took possession of the flour to load it for Brown, adding "and as the company's agent to forward it to Reading in Brown's name to Barnhart & Koch, as his consignees."

[*Wenger v. Barnhart.*]

But what was to be inferred from the use of this language . Did it bring the proper distinction clearly to the mind of the jury? Was the meaning that he took possession as the agent of Brown merely, and for the *purpose* as the agent of the company of afterwards forwarding the flour to the plaintiffs; or did it mean that then as agent of the company he actually took possession for the company, for the purpose of forwarding it? The expression is not clear, if indeed it is not ambiguous. It was just at this point the defendants were entitled to a clear instruction to enable the jury to understand that the flour must have arrived into the actual possession of the company for transportation to the plaintiffs. This was the vital point of the case, owing to the peculiar circumstances of it, which should have been presented clearly to distinguish the rights of the plaintiff from those of Brown merely. The judge then says, 'this fact of Wolf's taking possession completed the delivery.' But delivery to whom,—to Brown or to the company for the plaintiffs? This is not clear. Now in view that the entry in the manifest-book was made before the separation of the flour in the warehouse, that the flour was stored in the private warehouse and custody of Wolf for Wenger, that Wenger had the control of forwarding it, that the car was standing on Wolf's siding, that it was uncertain whether the loading was complete, that Wenger arrived perhaps in the nick of time to countermand the delivery to the company for transportation, and that having retaken the flour and sent it to Philadelphia, his act was ratified by Brown, it was the duty of the judge to bring to the view of the jury the precise party and the character of the delivery requisite in order to vest title in the plaintiffs as the consignees of Brown. The instruction we think was inadequate to this purpose, tended to mislead, and was therefore erroneous. In addition to this, the effect of the judge's preliminary remarks may not have aided the jury in grasping his meaning fully, but perhaps the contrary.

The judgment is reversed, and a *venire de novo* awarded.